**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re GLOBAL OUTREACH, S.A., | Civil Action No.: 11-620 (JLL) |
| Debtor. | **OPINION** |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | |
| YA GLOBAL INVESTMENTS, L.P., | |
| Appellant, | |
| v. | |
| GLOBAL OUTREACH, S.A., et al., | |
| Appellees. | |

**LINARES**, District Judge.

This matter comes before the Court on the appeal of YA Global Investments, L.P. ("YA") and the cross appeal of the Official Committee of Unsecured Creditors of Global Outreach, S.A. (the "Committee") from the Order of the Honorable Donald H. Steckroth of the United States Bankruptcy Court, District of New Jersey, entered on October 6, 2010, granting summary judgment[1] in favor of Global Outreach, S.A. (the "Debtor") and the Committee. The Court held oral argument on May 10, 2011 and has considered the parties' oral and written arguments. For

---

[1]The Bankruptcy Court did not render a decision as to certain "secondary claims" in connection with its summary judgment decision, but the parties subsequently agreed to sever those claims, and on November 30, 2010 the Bankruptcy Court entered final judgment. (Br. of Appellant at 15.)

the reasons set forth below, the decision of the Bankruptcy Court is affirmed in part and reversed in part, and will be remanded for further proceedings.

I.      BACKGROUND

A.      Factual and Procedural History

The background of this dispute has been set forth in detail by the Bankruptcy Court.  See In re Global Outreach, S.A., Bankr. No. 09-15985, 2010 WL 3957501 (Bankr. D.N.J. Oct. 6, 2010) (hereinafter "Op.").  Accordingly, this Court sets forth only those facts that are relevant to this appeal.

In 2004, the Debtor, a Costa Rican corporation,[2] through its president, Anil Kothari ("Kothari"), began a project to develop a resort property in Guanacaste, Costa Rica, acquiring certain parcels of land and options to purchase others.  The project was to comprise a 550-acre property containing a hotel, a golf course, and condominiums.  Beginning in 2005 and continuing in 2006, the Debtor raised capital for the project by issuing promissory notes and by selling option agreements to investors, which included options to acquire condominiums to be built at the resort and "option/note agreements" that permitted an investor to choose between acquiring a condominium or recovering his investment as a loan.  A number of these agreements contained provisions that triggered default if the Debtor transferred its interest in the underlying property. Throughout this time, the Debtor also sought financing in the approximate amount of $85 million to construct the hotel, golf course, and initial condominiums.

By early 2007, the Debtor's land options were nearing expiration, and in April of that

---

[2]The principal shareholder of the Debtor is an entity called Global Outreach LLC.  (R. at 2849 (Committee's Rule 56 Stmt. ¶ 3 n.2).)

year the Debtor was introduced to YA, seeking an initial loan of $35–$38 million.  The Debtor made two presentations to YA, and afterward Kothari was asked to complete a due diligence questionnaire.  Kothari made various misrepresentations and omissions in the questionnaire, including failing to disclose the existence of the option agreements and promissory notes, falsely stating that he had no previous bankruptcy filings, and failing to disclose a previous conviction for real estate fraud.  While YA contends that it did not become aware of many of these misrepresentations and omissions until after it had completed the transaction with the Debtor, YA does state that at the time of the loan it had learned, through its own independent investigation, of Kothari's fraud conviction and of Kothari and his wife's personal bankruptcies.

On April 30, 2007, YA made an initial loan to the Debtor in the amount of $3.725 million.  In connection with this loan, the Debtor, Kothari, and Purple Skies Business Sociedad de Responsabilidad Limitada ("Purple Skies")—a wholly owned subsidiary of the Debtor—entered into an agreement with YA and Interlex Fideicomisos, S.A. ("Interlex"), a Costa Rican corporation.  Pursuant to this agreement, the Azulera Project Guarantee Trust Agreement (the "Trust Agreement"), the Debtor first transferred to Purple Skies, then to Interlex, as trustee, its title to the resort properties.  The Trust Agreement states that its purpose is "to retain the Properties free of any mortgages, liens, encumbrances, attachments or other right in favor of a third party, and with all taxes paid up to date, as security for the recovery of all obligations owed to [YA] . . . ."  (R. at 1370 (Trust Agreement § 10.1).)  The Trust Agreement also provides that the Debtor "shall remain in possession of the Properties throughout the term . . . and shall have all necessary power to use, administer, operate, develop and manage the Properties."  (Id. at 1371 (Trust Agreement § 11.1).)  The agreement further provides that the

trustee could "cause such Properties to be mortgaged in favor of [YA] at the request of [YA], to secure the rights of [YA] made under the Loan Documents."  (Id. at 1367 (Trust Agreement § 1.3).)

Between April 30, 2007 and July 2007, YA made three additional loans to the Debtor, and on July 19, all of the Debtor's outstanding loans from YA were refinanced by a loan in the principal amount of $41 million.  The loan was documented by a promissory note (the "Note"), a "Note Purchase Agreement," and other ancillary documents, and the Trust Agreement was amended to reflect the new principal amount.  The Note matured on January 1, 2010 and carries a stated interest rate of 18% per annum, with a 5% increase upon default.  The Note contains the following usury savings clause:

> 13. **Usury Savings Provision.**  This Note is subject to the express condition that, at no time shall Borrower be obligated or required to pay interest at a rate that could subject Lender to either civil or criminal liability, or that could adversely affect the rights of Lender hereunder, as a result of such rate exceeding the maximum rate that Borrower is permitted by law to contract to agree to pay.  If, by the terms of this Note or any other instrument, Borrower is at any time required or obligated to pay interest at a rate exceeding such maximum rate, interest payable hereunder shall be computed (or recomputed) at such maximum rate, and the portion of all prior interest payments exceeding such maximum shall be applied to payment of principal hereunder.

(R. at 1283 (Note § 13).)

The Note Purchase Agreement provides for the Debtor to pay a non-refundable origination fee in the amount of $2,050,000, as well as certain "equity participation payments," which total approximately $38 million.  The agreement provides:

> 7.2 **Equity Participation.**  (a) Phase I Payment.  The Company [Debtor] shall cause completion of Phase I of the Project to be completed by February 1, 2009.  Upon the earlier of the maturity date of the Note or the completion of Phase I of the Project, the Company shall pay to the Investor [YA] cash in the amount equal to the greater of (x) U.S. $22,050,000, and (y) fifteen percent (15%) of (i) the Appraised Value of the Project as of the completion of Phase I minus (ii) the sum of the outstanding senior indebtedness

of the Company with respect to the Project at such time, the outstanding indebtedness of the Company to the Investor under the Note at such time, and the total cash equity contributed by Kothari to the project with respect to Phase I as of such time.

(b) Phase II Payment.  The Company shall make a cash payment to the Investor in respect of Phase II of the Project as such payment shall be U.S. $15,890,000; and if such payment is not made in full prior to April 1, 2011, such payment shall be the greater of (x) U.S. $15,890,000, and (y) four percent (4%) of (i) the sum of the outstanding senior indebtedness of the Company with respect to the Project and the outstanding indebtedness of the Company to the Investor under the Note at such time.  If such payment is not made prior to April 1, 2011, then the timing of such payment shall be on the third or fourth anniversary of the Closing Date, at the Investor's election.  In accordance with Section 7.3 hereto, fifty percent (50%) of the Monitoring Expenses shall be recoverable by the Company as an offset to the Phase II payment due Investor under this Section.

(R. at 1305 (Note Purchase Agreement § 7.2).)

In late 2007 or early 2008, YA became aware of the holders of the options and promissory notes and sent a default notice to the Debtor on April 3, 2008.  On April 16, 2008, YA commenced an action against the Debtor in the Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. HUD–C–60–08.  In August 2008, YA exercised its right under the Trust Agreement to obtain a mortgage on all of the Debtor's real property in Costa Rica.  On March 12, 2009, the Debtor filed for Chapter 11 bankruptcy, and the state court action was removed to this District.  On March 20, the Debtor commenced an adversary proceeding against YA, and on August 17, 2009, the Bankruptcy Court permitted the Committee to intervene in that proceeding.  Thereafter, the Bankruptcy Court entered an Order authorizing the Committee to assert the rights of the Debtor's estate on its behalf.  On September 16, 2009, the Bankruptcy Court consolidated the adversary proceeding and YA's removed state court action.

## B.    Ruling of the Bankruptcy Court

On October, 6, 2010, the Bankruptcy Court granted summary judgment in favor of the Committee and the Debtor on various counts of the relevant complaints.  See Op. at *21.  The

Bankruptcy Court held that the transfer of the Debtor's title to the properties by way of the Trust Agreement was an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and N.J.S.A. 25:2–26, and that YA was not entitled to retain the fraudulently transferred properties under 11 U.S.C. § 550(b).  The Bankruptcy Court further held the equity participation payments provided in the Note Purchase Agreement violated the New Jersey criminal usury statute, characterizing those payments as debt, declining to apply the usury savings clause contained in the Note, and fixing YA's claim at $38.95 million, the principal amount lent to the Debtor, less the origination fee.  On November 30, 2010, the Bankruptcy Court entered final judgment.

## II.   JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).  Under Rule 8013 of the Federal Rules of Bankruptcy Procedure, a district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  In bankruptcy cases, the district court serves an appellate function.  Thus, the Court reviews findings of fact under a clearly erroneous standard and legal conclusions under a de novo standard.  Fed. R. Bankr. P. 8013; In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3d Cir. 1989).  A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  In re Cellnet Data Systems, Inc., 327 F.3d 242, 244 (3d Cir. 2003) (citing United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.

Legal conclusions of the bankruptcy court are subject to de novo review. J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp, 891 F.2d 66, 69 (3d Cir. 1989); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981). For determinations that involve mixed questions of law and fact, a district court must apply a mixed standard of review. Mellon Bank, N.A. v. Metro Commc'n, Inc., 945 F.2d 635, 642 (3d Cir. 1991). This Court must accept the Bankruptcy Court's findings of historical or narrative facts unless clearly erroneous, but exercises "plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." Universal Minerals, 669 F.2d at 103. Additionally, the bankruptcy court's exercises of discretion are reviewed for abuse thereof. Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 353 (3d Cir. 2002).

## III.   DISCUSSION

YA appeals, challenging a number of its underlying rulings regarding (A) fraudulent transfer and (B) usury. The Committee and the Debtor oppose YA's appeal, and the Committee and the Debtor cross appeal, arguing that the Bankruptcy Court (C) abused its discretion in failing to apply the doctrine of unclean hands to subordinate YA's claims.[3]

### A.   Fraudulent Transfer

The Bankruptcy Court held that (1) the Debtor's transfer of title to the Costa Rican properties to Interlex, by way of the Trust Agreement, was an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and N.J.S.A. 25:2–26, and that (2) YA was not entitled to retain the fraudulently transferred properties under 11 U.S.C. § 550(b). The Court addresses those rulings

---

[3]The Committee submitted the majority of the argument in opposition to this appeal and in support of its cross appeal. The Debtor's brief adopted the Committee's arguments, with the exception of the fraudulent transfer issue, on which the Debtor appears to have taken no position.

in turn.

1.      The Bankruptcy Court's Finding of Fraudulent Intent

While the Bankruptcy Court found that the Debtor's transfer of properties violated both federal and state law, it focused its analysis on state law.  The New Jersey Uniform Fraudulent Conveyance Act provides, in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> a)   With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> b)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . .

N.J.S.A. § 25:2–25.  The only issue in dispute before the Bankruptcy Court was whether the transfer was made with "actual intent to hinder, delay, or defraud any creditor of the debtor" under subsection (a).  See also 11 U.S.C. § 548(a)(1)(A) (using identical language).  Because direct evidence of fraud can be difficult to adduce, courts look to circumstantial evidence in the form of "badges of fraud."  New Jersey law provides the following non-exclusive list of badges of fraud:

a)  The transfer or obligation was to an insider;

b)  The debtor retained possession or control of the property transferred after the transfer;

c)  The transfer or obligation was disclosed or concealed;

d)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e)  The transfer was of substantially all the debtor's assets;

f)  The debtor absconded;

g)  The debtor removed or concealed assets;

h)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j)  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k)  The debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

N.J.S.A. 25:2-26.  A finding by a court that one badge of fraud is present may "cast suspicion on the transferor's intent," but a finding of "several in one transaction generally provides conclusive evidence of an actual intent to defraud."  Gilchinsky v. National Westminster Bank N.J., 732 A.2d 482, 489–90 (N.J. 1999).  "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent."  Id.

The Bankruptcy Court based its finding of fraudulent intent on the stated purpose of the Trust Agreement and the following badges of fraud:

b)  Retention by the Debtor of possession or control of the properties;

c)  Concealment of the transfer from the Debtor's creditors;

d)  That the Debtor had been threatened with suit before the transfer was made; and

e)  That substantially all of the Debtor's assets were transferred.

Op. at *7.  The Bankruptcy Court held that the Trust Agreement's stated purpose "to retain the Properties free of any mortgages, liens, encumbrances, attachments or other right in favor of a third party," together with the above badges of fraud, "sufficiently establishes that the intended purpose of the transfer was to hinder, delay, or defraud creditors of the Debtor other than YA." Id.  The Bankruptcy Court found these to be "specific, undisputed facts that demonstrate the

Debtor's intent." Id. at *8.

A movant is entitled to summary judgment only where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, the only undisputed fact pertained to the Bankruptcy Court's findings with respect to the language of the Trust Agreement itself. Beyond that, the record is clear that disputed genuine issues of material fact existed as to: (a) whether the transfer was concealed from creditors, (b) whether the Debtor had been threatened with suit before transfer was made, and (c) whether substantially all of the Debtor's assets were transferred. The Court will now address each of these factual disputes in detail and further examine the extent to which these issues of fact, which are clearly material, undermine the Bankruptcy Court's conclusions regarding (d) the purpose of the Trust Agreement and any retention by the Debtor of possession or control of the properties.

a.    Concealment From Creditors

With respect to the factual issue of concealment from creditors, the Bankruptcy Court cites the Committee's statement of undisputed facts pursuant to Local Civil Rule 56.1 ("Rule 56 Statement") for the proposition that there is "evidence that the transfer was concealed from the Debtor's existing creditors - the note and option holders - since the transfer was an event of default under those debt instruments." Op. at *7. The cited portion of the Committee's Rule 56 Statement asserts that "[s]ince the transfer of ownership was a default under many of the option agreements, any such disclosure would have announced a default." (R. at 2857 (Committee's Rule 56 Stmt. ¶ 25); see also id. at 2849 (Committee's Rule 56 Stmt. ¶ 3.) (citing the option/note agreements, which provide that the Debtor "will be in default under this Agreement if . . .

ownership of the Property is changed for any reason").)[4]  In its responsive statement, YA denied the Committee's assertions regarding the default provisions, (R. at 4678, 4682 (YA's Rule 56 Stmt. ¶¶ 3, 25)).  The Bankruptcy Court's Opinion provides no explanation as to why YA's denial was not considered or why it does not raise a genuine issue of fact that is material to the fraudulent transfer issue.  While the Trust Agreement's default provisions do support an inference that the transfer was concealed from the Debtor's existing creditors, such an inference does not alone support a conclusive finding of actual concealment in this case.  Indeed, YA points to evidence that would support a different inference, i.e., that the option and note holders were aware that the Debtor would seek secured financing, noting that the option agreements expressly contemplate that a lien might be placed on the properties.  (Br. of Appellant at 21 (citing R. at 3902 (Reservation and Option Agreement/Note § 9), R. at 4600 (YA's Br. in Opp'n to the Committee's Mot. for Summ. J. at 8)).)  This Court finds that YA was entitled to rebut the factual issues underlying the allegation of concealment, and a grant of summary judgment as to this badge of fraud was therefore inappropriate.

b.     Whether the Debtor Was Threatened with Suit

With respect to the factual issue of whether the Debtor had been threatened with suit before transfer was made, the Bankruptcy Court relies on the Committee's Rule 56 Statement[5]

---

[4]The Committee's Rule 56 Statement also baldly asserts that "there is no evidence that Mr. Kothari" disclosed the transfer "to the option holders and note holders"; however, it cites no evidence in support of this proposition.  (R. at 2857 (Committee's Rule 56 Stmt. ¶ 25).)  Factual assertions lacking evidential support in the record cannot serve to support an award of summary judgment.  L. Civ. R. 56.1.

[5]The Bankruptcy Court did not cite this evidence in direct support of its conclusion regarding this badge of fraud, but rather included it as part of its statement of the undisputed facts.  This Court therefore presumes that this was the evidence upon which the Bankruptcy

for the proposition that "[a]t the time of the transfer, much of the Debtor's previously issued debt had matured and, despite demands from some of the holders, no payments had been made."  Op. at *2.  The cited portion of the Committee's Rule 56 Statement asserts that "several of the option holders or note holders had been in contact with Mr. Kothari attempting to collect their debts," citing YA's state court complaint against the Debtor and a demand letter from Joan and David Green addressed to Global Outreach LLC and dated March 19, 2007.  (R. at 2856 (Committee's Rule 56 Stmt. ¶ 23); see R. at 1701.)  YA's Rule 56 Statement admits that "at least one promissory note issued in 2006 by Kothari was past due," (R. at 4681 (YA's Rule 56 Stmt. ¶ 23)), but further states that "Global Outreach, S.A. had not been threatened with suit; instead, Global Outreach, LLC, Anil Kothari, and Hemangini Kothari had been threatened with suit," citing the demand letter from the Greens to Global Outreach LLC, (id. at 4682, ¶ 26)).  This Court therefore finds that a dispute supported by evidence in the record exists as to whether the Debtor itself or only its shareholders, Kothari and Global Outreach LLC, were threatened with suit before the transfer was made.  As the Bankruptcy Court made no finding regarding the relationship between the Debtor and its shareholders, summary judgment on this badge of fraud was also inappropriate.

c.    Transfer of Substantially All Assets

With respect to the factual issue of whether substantially all of the Debtor's assets were transferred, the Bankruptcy Court relies on the Committee's Rule 56 Statement[6] for the

Court's conclusion was based.

[6]The Bankruptcy Court did not cite this evidence in direct support of its conclusion regarding this badge of fraud, but rather included it as part of its statement of the undisputed facts.  This Court therefore presumes that this was the evidence upon which the Bankruptcy

proposition that "[p]ursuant to the Trust Agreement, the Debtor transferred to Interlex, as trustee, all of its interests in the entities that held title to properties and its options to acquire additional properties." Op. at *2 (citing R. at 2856 (Committee's Rule 56 Stmt. ¶ 24)). YA's Rule 56 Statement denies this assertion, stating that "the [Bankruptcy] Court has held that 'the Debtor's use, possession, management, and development of the properties coupled with the right to redeem and the right to excess proceeds provide sufficient and multiple interests in the Properties to constitute property of the estate,' " citing the Bankruptcy Court's June 8, 2009 Opinion enforcing the automatic stay pending bankruptcy proceedings. (R. at 4681–82 (YA's Rule 56 Stmt. ¶ 24).) The Bankruptcy Court's summary judgment Opinion does not address the extent to which the Debtor's right to use, possess, manage, and develop the properties, along with its right of redemption and right to excess proceeds, might weigh against a finding that substantially all of the Debtor's assets were transferred. Indeed, the Bankruptcy Court had itself previously found that these facts supported a finding that the Debtor's rights under the agreement were sufficient "to constitute property of the estate" after the transfer was effected. These disputes thus create a genuine issue of material fact as to whether the Debtor transferred substantially all of its assets. Summary judgment on this badge of fraud was therefore inappropriate.

d.   Retention of Possession or Control and the Stated Purpose of the Trust Agreement

In addition to the previously discussed disputed factual issues, the Bankruptcy Court based its conclusion regarding fraudulent transfer on the stated purpose of the Trust Agreement and the second badge of fraud, retention of possession or control of the property transferred. Both of these findings appear to have been based on the language of the Trust Agreement alone.

---

Court's conclusion was based.

The Trust Agreement states that its purpose is "to retain the Properties free of any mortgages, liens, encumbrances, attachments or other right in favor of a third party, and with all taxes paid up to date, as security for the recovery of all obligations owed to [YA]," (R. at 1370 (Trust Agreement § 10.1)), and further provides that the Debtor "shall remain in possession of the Properties throughout the term . . . and shall have all necessary power to use, administer, operate, develop and manage the Properties," (id. at 1371 (Trust Agreement § 11.1)).

While this language does support an inference that the Debtor sought to place the properties beyond the reach of the option/note holders, it does not conclusively establish an actual intent to hinder, delay, or defraud the Debtor's creditors when divorced from the context and circumstances surrounding the transaction.  The issue of intent with respect to a fraudulent transfer is rarely amenable to resolution at summary judgment.  See, e.g., In re Metro Shippers, Inc., 78 B.R. 747, 751 (Bankr. E.D. Pa. 1987) ("In general, questions of motive and intent are particularly difficult to resolve without trial, because subjective feelings resist reduction to the forms of evidence which can be submitted on motion for summary judgment."); In re IDS Holding Co., LLC, 292 B.R. 233 (Bankr. D. Conn. 2003) ("Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles."); see also Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 524 (3d Cir. 2004) ("The issue of intent is particularly inappropriate for resolution by summary judgment because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ.") (quotation omitted). Here, only two indicia of fraud could even arguably be established by the undisputed facts, but those facts are limited to the language of the Trust Agreement itself; however, the circumstances

under which the agreement was consummated remain in dispute.  While there may be situations in which parties draft a document that directly evidences a fraudulent intent, in this case the provisions of the Trust Agreement provide no such direct evidence.  Instead, the Trust Agreement provides that the transfer was effected as a means of securing YA's loans, a fact which, when viewed in light of the amount loaned, seems to support the contrary inference that the transfer was in fact not made with fraudulent intent.  No evidentiary hearing was held to further develop these facts and potentially resolve the disputed issues identified in the parties' Rule 56 statements.  Instead, the Bankruptcy Court granted summary judgment on a matter in which the underlying disputed facts needed a resolution prior to any ruling as a matter of law by the court.  In the absence of a more developed factual background, one badge of fraud, viewed in light of the stated purpose of the transaction, only serves to "cast suspicion on the transferor's intent" and does not, at the summary judgment stage, conclusively establish intent to defraud in this case.  This Court therefore reverses the ruling of the Bankruptcy Court and remands on this issue for further action consistent with this Opinion.

2.     Recovery Under § 550

Once the Bankruptcy Court avoided transfer of the Debtor's properties, the Court then addressed whether YA may nonetheless retain the property that was fraudulently transferred.  If a transfer is avoided, the Bankruptcy Code allows a bankruptcy trustee to recover from certain transferees, subject to a limited exception.  The statute provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from--

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. The statute thus provides generally for the recovery of property in an avoided transfer, with the exception that a trustee may not recover from subsequent transferees[7] under subsection (a)(2) who "take for value . . . in good faith, and without knowledge of the voidability of the transfer avoided."

In holding the "good faith" exception[8] under § 550(b) to be unavailable to YA, the Bankruptcy Court based its conclusion on two grounds. First, after considering the relevant case law, the Bankruptcy Court concluded that a single party can be both a subsequent transferee, under subsection (a)(2), and the party for whose benefit the transfer was made, under subsection (a)(1). The Bankruptcy Court stated that while YA was a subsequent transferee, having received its lien on the Debtor's property from Interlex by way of a mortgage, the initial transfer to Interlex was nonetheless made for the benefit of YA, as it "was effected as a means of protecting and securing YA's loans." Op. at *10. Thus, because YA fell under subsection (a)(1), it was barred from taking advantage of the protections of subsection (b). In the alternative, the

---

[7]Entities falling under subsection (a)(2) as "immediate or mediate" transferees from the initial transferee are often referred to as "subsequent transferees," a convention which the Court follows here.

[8]For brevity, the Court refers to the exception provided under subsection (b) as the "good faith" exception, acknowledging that the provision contains other elements.

Bankruptcy Court held that even if YA fell under subsection (a)(2), YA was not, as a factual matter, a good faith transferee without knowledge.

YA urges that the Bankruptcy Court erred in holding that an entity may fall under either § 550(a)(1) or § 550(a)(2), pointing to cases from the Fourth, Seventh, and Ninth Circuits, as well as several district and bankruptcy courts within other Circuits, that have held those provisions to be mutually exclusive.  This case law derives generally from <u>Bonded Financial Services v. European American Bank</u>, 838 F.2d 890, 895 (7th Cir.1988), a decision which held that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." Noting a lack of guidance in the legislative history, the Seventh Circuit reasoned:

> The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other.  The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise.  The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor—someone who receives the benefit but not the money.

<u>Id.</u> at 895.  The court describes this "paradigm" case as one in which a firm borrows money from a lender with a guarantor providing a surety.  <u>Id.</u>  When the firm pays off the debt, the lender is the "initial transferee" of that payment, and the guarantor is the "entity for whose benefit [the] transfer was made," as its liability is reduced accordingly.  <u>Id.</u>  The court explained:

> Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated.  If B gave value to the bankrupt for the benefit, B will receive credit in the bankruptcy.

<u>Id.</u> at 896.  Other courts have applied and extended this reasoning, with at least one holding that "[a] subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer."  <u>In re</u>

Bullion Reserve of North America, 922 F.2d 544, 548 (9th Cir. 1991); see, e.g., In re Columbia

Data Prod., Inc., 892 F.2d 26, 28 (4th Cir. 1992); In re The Heritage Organization, L.L.C., 413

B.R. 438 (Bankr. N.D. Tex. 2009); In re Circuit Alliance, Inc., 228 B.R. 225, 234 (Bankr.

D.Minn. 1998).

       In holding the designations in subsections (a)(1) and (a)(2) to be non-exclusive, the

Bankruptcy Court stated that it found "little support in the text of § 550 to justify the limitation

imposed by the Seventh Circuit in Bonded," relying instead on Max Sugarman Funeral Home,

Inc. v. A.D.B. Investors, 926 F.2d 1248 (1st Cir. 1991).  Op. at *9.  In Sugarman, the First

Circuit addressed a case in which a debtor had transferred assets to entities owned by a judgment

creditor.  926 F.2d at 1255.  In permitting the assets to be recovered, the court found that the

creditor was either an entity for whose benefit the transfer was made, under subsection (a)(1), or

"alternatively" a bad faith subsequent transferee under (a)(2).  Id. at 1256–57.  Based on this

holding, the Bankruptcy Court appears to have interpreted Sugarman as implicitly rejecting the

mutual exclusivity announced in Bonded and its progeny.  See Op. at *10.  Sugarman can also be

read, however, as merely acting upon the Seventh Circuit's observation that "[t]o say that the

categories 'transferee' and 'entity for whose benefit such transfer was made' are mutually

exclusive does not necessarily make it easy to determine in which category a given entity falls."

Bonded, 838 F.2d at 896.  Thus, Sugarman arguably stands for the proposition that a court may

decline to make this difficult distinction in cases in which the elements of the good faith

exception under § 550(b), if applicable, cannot be met.

       The Committee nonetheless argues that this Court should squarely reject the Bonded

interpretation and find the categories in subsections (a)(1) and (a)(2) to be entirely non-exclusive.

To show that <u>Bonded</u>'s "paradigm" case may become more complicated in practice, the

Committee offers the following hypothetical:

> Suppose such transfer is a security interest in the debtor's property, and the transfer is avoidable.  Suppose further that, after the default by the debtor, the creditor calls upon the guarantee, the guarantor pays the creditor and receives, by assignment or subrogation, a transfer of the creditor's security in the debtor's property.  The guarantor, already the entity for whose benefit the transfer was made, has become a subsequent transferee of the same transfer.

(Br. of Appellee at 26 n.12.)  The Committee thus argues that there is no reason, as a practical

matter, why an entity for whose benefit an initial transfer was made could not subsequently

receive the transferred property from the initial transferee.  Indeed, the Committee's hypothetical

imagines an entirely plausible scenario in which such a transaction might occur.  In such a case,

one could logically say that the guarantor was both the "entity for whose benefit such transfer

was made," under § 550(a)(1), and an "immediate or mediate transferee of [the] initial

transferee," under subsection (a)(2).  The Committee argues that "[a] trustee in bankruptcy

seeking to avoid the transfer should not have to choose into which one of the supposedly

exclusive categories the guarantor fits, with the consequence that, if the trustee chooses

incorrectly, the guarantor gets to keep an otherwise invalid lien."  <u>Id.</u>

   While the Court agrees that in the universe of financial transactions, cases will surely

arise in which an entity logically fits the literal language of both subsections (a)(1) and (a)(2), the

statutory language commands that <u>legally</u> an entity may fall into only one category.  As noted by

the court in <u>Bonded</u>, the structure of the statute separates initial transferees from "immediate or

mediate transferee[s]," implying that the "entity for whose benefit" a transfer was made is

different from a transferee, whether initial or subsequent.  This distinction ensures that the "good

faith" carve-out under subsection (b) remains meaningful, because if subsections (a)(1) and (a)(2)

were non-exclusive, the statute could permit a trustee to recover under (a)(1) while simultaneously denying such recovery under (a)(2).  The Court thus agrees with the Seventh Circuit in <u>Bonded</u>, and the weight of authority following that decision, that the categories in subsections (a)(1) and (a)(2) are mutually exclusive.  <u>Cf.</u> <u>In re B.S. Livingston & Co., Inc.</u>, 186 B.R. 841, 864–65 (D.N.J. 1995) (noting that under § 550 "transferees and entities who benefit from the transfer are distinct") (citing <u>Bonded</u>).

The Bankruptcy Court, however, did not err in denying YA the protections of § 550(b), as YA was the "entity for whose benefit" the transfer of Debtor's property was made, under § 550(a)(1).  There is no dispute that the Trust Agreement was executed in order to provide security for loans that YA extended to the Debtor.  The Trust Agreement provided that title to the Debtor's properties be transferred to a third party trustee, Interlex, and further provided that the trustee could cause the transferred properties "to be mortgaged in favor of [YA] at the request of [YA], to secure the rights of [YA]."  The transfer to Interlex was thus executed for the benefit of YA, as the secured lender.  That YA later exercised its option to mortgage the property does not alter this analysis; it can hardly be said that YA was a subsequent transferee within the meaning of subsection (a)(2) when YA received in the initial transaction both the benefit of its secured position and the right to mortgage the properties.  Any subsequent transfer occurred only because those rights under the initial transfer were in place.  Indeed, the mortgage occurred in connection with YA's state court litigation over the same secured lending.  This Court thus affirms the holding of the Bankruptcy Court that the trustee may recover the transferred properties from YA under 11 U.S.C. § 550, to the extent that such transfer may be avoidable.

**B.**     **Usury**

The Bankruptcy Court held that the equity participation payments provided in the Note Purchase Agreement violated the New Jersey criminal usury statute, N.J.S.A. 2C:21-19(a), (1) characterizing those payments as debt, rather than equity, and (2) holding that a civil statute barring corporations from raising a usury defense did not apply.  The Bankruptcy Court further held that criminal usury does not contain a scienter element and that the usury savings clause contained in the Note was unenforceable as against public policy.  Based on these holdings, the Bankruptcy Court denied YA's recovery of the equity participation payments, fixing its claim at the principal amount lent to the Debtor, less the origination fee.  On appeal, YA challenges each of these rulings.

1.     Characterization

YA does not dispute that the Bankruptcy Court correctly deemed the equity participation payments to be debt.  Rather, YA argues that the payments should have been characterized as additional principal, as opposed to interest.  YA argues that while the payments were agreed to as additional consideration for the loan, they varied with the value of the project and thus cannot be considered interest.  YA fails to explain, however, how funds that were not given to the borrower as part of the loan, but were instead due as payment in consideration for the loan, could fit within any usual definition of "principal."  Here, while the equity participation payments did vary somewhat with the value of the project, the Bankruptcy Court aptly noted that Note Purchase Agreement explicitly provided that minimum equity participation payments be due by specific dates.  See Op. at *13.  YA has provided no authority to support its contention that fixed obligations of this sort can be characterized as principal, and the requirement that minimum

payments be due at certain times strongly suggests that the equity participation payments are best characterized as interest.  This Court therefore finds that the Bankruptcy Court's characterization was correct.

2.       Availability of the Usury Defense to Corporations

Deeming the equity participation payments to be interest, the Bankruptcy Court then held that the payments violated the New Jersey criminal usury statute.[9]  The statute provides, in relevant part:

> A person is guilty of criminal usury when not being authorized or permitted by law to do so, he:
>
> > (1) Loans or agrees to loan, directly or indirectly, any money or other property at a rate exceeding the maximum rate permitted by law; or
> >
> > (2) Takes, agrees to take, or receives any money or other property as interest on the loan or on the forbearance of any money or other interest in excess of the maximum rate permitted by law.
>
> For the purposes of this section and notwithstanding any law of this State which permits as a maximum interest rate a rate or rates agreed to by the parties of the transaction, any loan or forbearance with an interest rate which exceeds 30% per annum shall not be a rate authorized or permitted by law, except if the loan or forbearance is made to a corporation, limited liability company or limited liability partnership any rate not in excess of 50% per annum shall be a rate authorized or permitted by law.

N.J.S.A. 2C:21-19(a).  However, a civil statute also provides:

> No corporation, limited liability company or limited liability partnership shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited liability partnership.

---

[9]The Court also held that the equity participation payments did not violate the New Jersey civil usury statute under N.J.S.A. 31:1-1(e)(1), a ruling from which the parties do not appeal. The parties likewise do not dispute that the Bankruptcy Court correctly computed the effective interest rate of the equity participation payments to exceed 50% per annum.

N.J.S.A. 31:1-6.

New Jersey law thus plainly states that a corporation, like Debtor herein, may not raise the usury defense in "any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation," i.e., civil actions like this case.  Rejecting this unambiguous language, the Bankruptcy Court held that N.J.S.A. 31:1-6 is limited to public debt and thus did not bar the Debtor from raising the usury defense, relying on Mazarin v. Hudson County Real Estate, 80 N.J.L. 35, 37 (N.J. 1910).[10]  In Mazarin, the New Jersey Supreme Court stated that N.J.S.A. 31:1-6 "refers to corporate obligations in the sense of bonds, mortgages, debentures, and the like that go on the market and into the hands of the public."  80 N.J.L. at 37. The court reasoned that "[i]t is not rational to suppose that the Legislature intended to go further and weaken its public policy against usury by the construction that would make 'obligation' apply to an agreement to pay a usurious commission to an agent."  Id.  The Mazarin court thus held that the statute did not cover a corporate agreement to pay a brokerage commission.  Id.

More recently, however, the New Jersey courts have explained that the bar against corporations asserting the usury defense "to cover such obligations of corporations as bonds, mortgages and the like" includes promissory notes issued by such corporations.  See Feller v.

---

[10]The Bankruptcy Court further noted that the Committee was the party that actually raised the usury defense, apparently concluding that the Committee, an unincorporated organization, was not subject to the proscriptions of N.J.S.A. 31:1-6.  The Court must reject this conclusion, as earlier in the litigation the Bankruptcy Court ordered that the Committee could litigate claims on behalf of the Debtor's estate.  (See R. at 1079 (Order Granting Renewed Motion of the Official Committee of Unsecured Creditors of Global Outreach, S.A. to Prosecute Causes of Action on Behalf of, and Defend Claims Against, the Debtor's Estate, dated September 21, 2009).)  Where a committee sues on behalf of a debtor, the committee maintains only the rights of the debtor.  Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 347 (3d Cir. 2001).  Thus, any limitation on the Debtor's ability to assert the usury defense likewise limits the Committee's assertion of that defense on the Debtor's behalf.

Architects Display Bldgs., Inc., 148 A.2d 634, 638–39 (N.J. Super. Ct. App. Div. 1959); Fine v.

H. Klein, Inc., 77 A.2d 295, 297 (N.J. Super. Ct. Law Div. 1950).  In Fine, the court examined

the holding of Mazarin to determine whether N.J.S.A. 31:1-6 extended to corporate promissory

notes that were later secured by a chattel mortgage.  77 A.2d at 297.  Finding first that there was

"no question" that the statute applied to the chattel mortgage, the court stated that the "true test"

of whether corporate paper fell under N.J.S.A. 31:1-6 was not whether it had "come into the

hands of the public on the market," but rather whether "the instruments in fact are 'corporate

obligations in the sense of bonds, mortgages, debentures and the like.' "  Id. at 297–98 (quoting

Mazarin).  In adopting a test based on the "intrinsic character" of the debt, the court relied on

Grossman v. Calonia Land & Improvement Co., 103 N.J.L. 98 (N.J. 1926), observing that in that

case the high court rejected a lower court's adoption of a test based on the whether the debt was

publicly sold.  77 A.2d at 297.  The court in Fine then went on to conclude that the promissory

notes at issue fell within the meaning of "debentures and the like" under Mazarin, noting that,

like a typical corporate debenture, the promissory notes at issue where intrinsically unsecured

(though secured separately by the chattel mortgage).  Id. at 298.

Similarly, in Feller v. Architects Display Buildings, the Appellate Division held that

N.J.S.A. 31:1-6 precluded a corporation from raising the usury defense against loans extended to

the corporation as promissory notes and secured by a mortgage.  148 A.2d at 638–39.  This

District has likewise held the corporations are barred from raising the usury defense with respect

to their promissory notes.  See Bridges Financial Group, Inc. v. Beech Hill Co., No. 09-2686,

2010 WL 3946529, at *4 (D.N.J. Oct. 5, 2010) (rejecting a corporation's claim of criminal usury

based on N.J.S.A. 31:1-6, in a case involving a promissory note secured by two mortgages,

stating that "New Jersey corporations are not entitled to plead usury as a defense").  While the New Jersey Supreme Court has recognized that the courts have "tended to restrict the application of the statutory provision in order that sympathetic sweep might be given to the State's policy against usury," it applied that reasoning to a case in which "corporate device was invoked at the lender's insistence to circumvent or evade the State's policy against usurious exactions."  In re Greenberg, 121 A.2d 520, 524 (N.J. 1956).  The Committee has not raised a claim of abuse of the corporate form here.  The Bankruptcy Court thus erred in restricting the application N.J.S.A. 31:1-6 to public debt.  Here, as in Fine and Feller, the Debtor's usury defense arises from promissory notes executed by a corporation, the Debtor, and secured by a separate instrument, the amended Trust Agreement.  The Court is thus persuaded that the bar under N.J.S.A. 31:1-6 extends to corporate promissory notes.

The Committee nonetheless argues that the language in N.J.S.A. 2C:21-19(a) providing for the statute's application "notwithstanding any law of this State which permits as a maximum interest rate a rate or rates agreed to by the parties of the transaction" negates the effect of N.J.S.A. 31:1-6.  The Committee further points to Resolution Trust Corp. v. Minassian, 777 F. Supp. 385, 389 (D.N.J. 1991), which held that the civil usury statute, N.J.S.A. 31:1-1, et seq., "clearly incorporates the maximum interest rate established by the criminal statute."  As an initial matter, Minassian involved a loan to an individual and did not concern the effect of N.J.S.A. 31:1-6.  Furthermore, while the criminal statute does state that it should apply "notwithstanding any law of this State," so does N.J.S.A. 31:1-6 provide that the usury defense is not available to a corporation in "any action brought against it" seeking a civil remedy.  (emphasis added).  Indeed, as it is undisputed that N.J.S.A. 31:1-6 bars a corporation from claiming the protections of the

civil usury statute, and as <u>Minassian</u> holds that the civil usury statute incorporates the criminal

usury rate, it is unclear to this Court why the Committee's position would not simply open a back

door for corporations to raise a usury defense in civil cases where such defense would otherwise

be prohibited.  Such a reading would ignore the unambiguous language of N.J.S.A. 31:1-6.  The

Court thus concludes that the Bankruptcy Court erred in failing to apply N.J.S.A. 31:1-6 to the

Debtor's defense of usury in this civil case.

 Nevertheless, it is also undisputed that if the equity participation payments are treated as

interest, the effective interest rate exceeds the maximum rate allowable under the New Jersey

Criminal Code.  While the bar against corporations asserting the usury defense serves an

important policy of ensuring that corporate obligations are fulfilled, <u>see</u> <u>Fine</u>, 77 A.2d at 297, the

criminal law is concerned with preventing lenders, both individual and corporate, from exacting

usurious rates and punishing those who do, <u>see</u> N.J.S.A. 2C:1-2.  This case, however, pertains to

a <u>civil</u> litigation.  Nevertheless, given that the Note Purchase Agreement provides for a lending at

a forbidden rate under the criminal statute, it is appropriate for this Court to consider both the

proscription of the criminal statute and whether a civil remedy should be fashioned to conform

the Note Purchase Agreement to the strictures of N.J.S.A. 2C:21-19(a).  <u>Schuran, Inc. v. Walnut</u>

<u>Hill Assocs.</u>, 606 A.2d 885, 887–88 (N.J. Super. Ct. Law Div. 1991).  Whether, as YA argues,

the criminal usury statute implies a "knowing" intent requirement is irrelevant to this analysis, as

the Court is not herein addressing the elements that would be appropriate in a criminal

prosecution of the lender, but rather the equitable remedy that is appropriate under the

circumstances of this civil case.  <u>See id.</u> at 886 (determining an appropriate civil remedy "where

the <u>interest rate</u> violates N.J.S.A. 2C:21-19," without inquiring as to the culpability of the lender)

(emphasis added).

      The Bankruptcy Court relied on <u>Schuran</u> in concluding that YA should be barred from recovering any portion of the equity participation payments.  The court in <u>Schuran</u> indeed found that a violation of N.J.S.A. 2C:21-19(a) in the civil context warranted limiting the lender's recovery to principal only; however, it applied that statute for the benefit of a debtor that was organized as a general partnership and therefore not subject to the restrictions of N.J.S.A. 31:1-6. 606 A.2d at 888.  Where, as here, the debtor is barred from raising the usury defense, it would be overly harsh to excise all interest and limit the lender's claim to principal only, as public policy urges that a corporate debtor's obligations be enforced.  Indeed, the court in <u>Schuran</u> explained that "it is only the excessive interest itself which is made illegal by the statute."  <u>Id.</u>  The Court thus concludes that it is appropriate in this case to sever the excessive interest alone, barring YA's recovery only to the extent that the equity participation payments exceed the maximum interest rate provided in N.J.S.A. 2C:21-19(a).  The Court need not address YA's arguments with respect to the Note's usury savings clause, as the enforcement of that provision would appear to have substantially the same effect as the remedy adopted here.  Further, as the Bankruptcy Court made no findings regarding the Committee's alternative arguments that (a) the equity participation payments were constructively fraudulent, and (b) that the equity participation payments should be equitably subordinated, this Court declines to decide those issues in this appeal.  The parties may address those claims, and the computation of the precise monetary amount that this Court's ruling entitles YA to recover, on remand.

## C.    **Unclean Hands Cross Appeal**

      The Committee cross appeals that the Bankruptcy Court should have applied the doctrine

of unclean hands to equitably subordinate YA's claims.  The Committee argues that YA has

made misrepresentations regarding its prior notice of the Debtor's adverse credit history and that

YA has changed its position on certain issues since the state court proceedings.  Specifically, the

Committee points out that YA's appellate brief states that "only after" it had loaned the $41

million to the Debtor did it learn of the Debtor's prior misdeeds (see Br. of Appellant at 8), a

statement that, according to the Committee, YA knows to be false.  YA responds that the

statement was only meant to apply to its knowledge of the unsecured creditors, not to its

knowledge of Kothari's prior bankruptcy and criminal conviction, of which YA states that it

learned independently.  The Committee further alleges that YA argued to the state court that the

equity participation payments were not contingent, but took the opposite position before the

Bankruptcy Court.  The Committee also alleges that YA argued to the Bankruptcy Court that the

Debtor was solvent for the purpose of the fraudulent transfer inquiry, but abandoned that

argument on appeal.  YA responds that any inconsistency in its positions was inadvertent and

that, regardless, the Committee suffered no injury as a result thereof.

   The decision of whether to apply the equitable doctrine of unclean hands may be reversed

only if the bankruptcy court abused its discretion.  In re New Valley Corp., 181 F.3d 517, 522 (3d

Cir. 1999).  An abuse of discretion occurs when "the [trial] court's decisions rests upon a clearly

erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."

In re Marvel Entertainment Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998) (citations omitted).

Considering the Committee's allegations in light of the record as whole, the Court concludes that

the Bankruptcy Court did not abuse its discretion in failing to apply the unclean hands doctrine in

this case.  While it would be concerning if YA had made intentional misrepresentations regarding

its knowledge of the Debtor's financial status before entering the subject transaction, there is little evidence in the record to support such a conclusion, and the Bankruptcy Court acted well within its equitable discretion in declining to make that analytical leap.  Moreover, even if it were established that YA has changed its position on certain issues since the state court proceedings, the Committee has provided no evidence that any of the "inequitable conduct is immediately and necessarily related to the equity that [YA] seeks in this litigation," General Development Corp. v. Binstein, 743 F. Supp. 1115, 1134 (D.N.J. 1990), focusing instead on the conduct alone.  The Committee's cross appeal is thus denied.

## IV.    CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is affirmed in part and reversed in part and will be remanded for further proceedings.  An appropriate Order accompanies this Opinion.

DATED: June 6, 2011                                     /s/ Jose L. Linares_____
                                                       JOSE L. LINARES
                                                       UNITED STATES DISTRICT JUDGE